IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MONTEZ DIBRE WILLIS,
      Petitioner,

vs.                        Case No.:  4:15cv143/MW/EMT

JULIE L. JONES,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 17).  The court provided Petitioner an opportunity to file a reply (*see* ECF No. 18), but he has not filed one.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.       BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 17).[1]  Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2006-CF-119, with one count of burglary of a dwelling with assault (Count I), one count of attempted sexual battery (Count II), and one count of false imprisonment (Count III) (Ex. A at 1).  Following a jury trial, he was found guilty as charged (Ex. A at 85–90, Ex. D).  On March 24, 2008, Petitioner was sentenced to a "split" sentence of twenty years in prison followed by ten years of probation on Count I, a term of five years of probation on Count II, to run concurrently with the probationary term on Count I, and a term of five years of probation on Count III, to run concurrently with the probationary sentence on Count I and consecutive to the sentence on Count II (Ex. A at 95–103, Ex. E).  The court awarded pre-sentence jail credit of 803 days (*id.*).

_____

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 17).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D08-1542 (Ex. F).  The First DCA affirmed the judgment per curiam without written opinion on December 29, 2009, with the mandate issuing January 14, 2010 (Ex. I).  Willis v. State, 23 So. 3d 1188 (Fla. 1st DCA 2009) (Table).

On November 15, 2010, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. J at 1–12). The state circuit court determined that an evidentiary hearing was warranted, and appointed counsel to represent Petitioner (id. at 17, 26, 32).  The evidentiary hearing was held on March 8, 2013 (id. at 41–112 ).  At the conclusion of the hearing, the court denied Petitioner's claims, announcing its reasons on the record (id. at 106–10). The court also issued a written decision denying the Rule 3.850 motion for the reasons stated on the record at the evidentiary hearing (id. at 33).  Petitioner appealed the decision to the First DCA, Case No. 1D13-1325 (Ex. L).  The First DCA affirmed the decision per curiam without written opinion on February 10, 2015, with the mandate issuing March 10, 2015 (Ex. N).  Willis v. State, 158 So. 3d 572 (Fla. 1st DCA 2015) (Table).

Petitioner filed the instant federal habeas action on March 6, 2015 (ECF No. 1 at 16).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review

in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The

appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal
> habeas court to grant a state prisoner's application for a writ of habeas
> corpus with respect to claims adjudicated on the merits in state court.
> Under § 2254(d)(1), the writ may issue only if one of the following two
> conditions is satisfied—the state court adjudication resulted in a decision
> that (1) "was contrary to . . . clearly established Federal law, as
> determined by the Supreme Court of the United States," or (2) "involved
> an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States."  Under the
> "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by this court on a
> question of law or if the state court decides a case differently than this
> Court has on a set of materially indistinguishable facts.  Under the
> "unreasonable application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing legal principle from
> this Court's decisions but unreasonably applies that principle to the facts
> of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S.

156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme

Court has instructed that on any issue raised in a federal habeas petition upon which

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

there has been an adjudication on the merits in a formal State court proceeding, the

federal court should first ascertain the "clearly established Federal law," namely, "the

governing legal principle or principles set forth by the Supreme Court at the time the

state court render[ed] its decision." Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.

Ct. 1166, 155 L. Ed. 2d 144 (2003).  "Clearly established Federal law, includes only

the holdings, as opposed to the dicta, of the Supreme Court's decisions." Woods v.

Donald, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) (citation

omitted).

Next, the court must determine whether the State court adjudication is contrary

to the clearly established Supreme Court case law, either because "'the state court

applies a rule that contradicts the governing law set forth in [the Supreme Court's]

cases' or because 'the state court confronts a set of facts that are materially

indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives

at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73

(quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that

"[a]voiding these pitfalls does not require citation to our cases—indeed, it does not

even require awareness of our cases, so long as neither the reasoning nor the result of

the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct.

362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State

court decision is found in either respect to be contrary, the district court must

independently consider the merits of the petitioner's claim.  However, where there is

no Supreme Court precedent on point, the state court's conclusion cannot be contrary

to clearly established federal law. *See* Woods, 135 S. Ct. at 1377 (holding, as to claim

that counsel was per se ineffective in being absent from the courtroom for ten minutes

during testimony concerning other defendants:  "Because none of our cases confront

the specific question presented by this case, the state court's decision could not be

contrary to any holding from this Court." (internal quotation marks and citation

omitted)).

If on the other hand, the State court applied the correct Supreme Court

precedent and the facts of the Supreme Court cases and the petitioner's case are not

materially indistinguishable, the court must go to the third step and determine whether

the State court "unreasonably applied" the governing legal principles set forth in the

Supreme Court's cases.  The standard for an unreasonable application inquiry is

"whether the state court's application of clearly established federal law was

objectively unreasonable." Williams, 529 U.S. at 409.  Whether a State court's

decision was an unreasonable application of a legal principle must be assessed in light

of the record the court had before it.  <u>Holland v. Jackson</u>, 542 U.S. 649, 652, 124 S.

Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* <u>Bell v. Cone</u>, 535 U.S. 685, 697

n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not

presented to state court in determining whether its decision was contrary to federal

law).  "In determining whether a state court's decision represents an unreasonable

application of clearly established federal law, a federal court conducting habeas

review 'may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly.  Rather, that application must also be unreasonable.'" <u>Gill</u>

<u>v. Mecusker</u>, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting <u>Williams</u>, 529 U.S. at

411) (citing <u>Harrington v. Richter</u>, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d

624 (2011)).  The AEDPA's "unreasonable application" standard focuses on the state

court's ultimate conclusion, not the reasoning that led to it.  *See* <u>Gill</u>, *supra* at 1291

(citing <u>Richter</u>).  Under § 2254(d), a habeas court must determine what arguments or

theories supported or could have supported the state court's decision, and then ask

whether it is possible that fairminded jurists could disagree that those arguments or

theories are inconsistent with the holding in a prior decision of the Supreme Court.

*See* <u>Richter</u>, 562 U.S. at 102; *see also* <u>Gill</u>, *supra,* at 1292 (the federal district court

may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.

§ 2254(e)(1); *see, e.g.,* Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied § 2254(d) does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless

the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

III.    PETITIONER'S CLAIMS

A.    Ground One:  "The State trial court erred in denying Petitioner's motion to suppress DNA evidence, since the evidence was obtained without a warrant, it was obtained without consent, and it would not have been inevitably discovered, thereby depriving Petitioner of his rights to due process of law and to be free from unreasonable searched [sic] and seizures secured by both the Constitution of the State of Florida and the Constitution of the United States of America."

Petitioner claims that the trial court erred by denying his motion to suppress DNA samples collected from him, by means of a buccal swab and a penile swab, during an interview with law enforcement in an unrelated case, juvenile Case No. 2003-CJ-1356, on November 15, 2003 (the offense conduct underlying Petitioner's convictions in the instant case occurred on January 5, 2006) (ECF No. 1 at 6, Attachment 1).  In the motion to suppress, the defense argued that the DNA samples were taken without Petitioner's voluntary consent, because he had been declared incompetent to proceed in two juvenile cases (one of which was Case No. 2003-CJ-1356 and the other an unrelated case) both before and after collection of the DNA samples (Ex. A at 44–46).

Respondent concedes that Petitioner exhausted this claim in the state courts by presenting it on direct appeal (ECF No. 17 at 22).  Respondent contends the state courts' adjudication of the Fourth Amendment issue was not contrary to or an unreasonable application of Supreme Court precedent (*id.* at 22–29).

Although Respondent did not raise the issue, it is apparent that Petitioner's Fourth Amendment claim is not cognizable in federal habeas, pursuant to Stone v. Powell, 428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976).  The Stone v. Powell doctrine provides:  "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  428 U.S. 465, 494, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976) (footnotes omitted).  The Stone Court found that, in the habeas context, "the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force."  428 U.S. at 494–95 (footnote omitted).  "'For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court.'"  Mincey v.

Head, 206 F.3d 1106, 1126 (11th Cir. 2000) (quoting Tukes v. Dugger, 911 F.2d 508, 513–14 (11th Cir. 1990), in turn quoting Morgan v. Estelle, 588 F.2d 934, 941 (5th Cir. 1979)).

The state court record demonstrates that prior to Petitioner's trial, defense counsel sought suppression, on Fourth Amendment grounds, of DNA evidence collected by police officers (through buccal and penile swabs) during their interrogation of Petitioner in an unrelated case over two years prior to the offense conduct in the instant case (*see* Ex. A at 44–46). The trial court held an evidentiary hearing on the Fourth Amendment issue (Ex. B). The State presented testimony from police officers who conducted the allegedly illegal collection of DNA evidence, and the defense cross-examined those witnesses. Additionally, the defense presented testimony from two expert witnesses regarding Petitioner's mental capacity to knowingly and voluntarily consent to collection of the DNA evidence (*id.*). Counsel presented arguments on the suppression issue, including whether Petitioner's consent was knowing and voluntary (*id.*). Following the hearing, the trial court issued a written order, which included its factual findings and legal conclusions on the consent issue (Ex. A at 91–92). Petitioner raised the suppression issue on direct appeal (Ex. F). The state appellate court affirmed the judgment (Ex. I).

The state court record thus establishes that Petitioner received full and fair consideration of his Fourth Amendment claim in the state courts.  Because Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in the Florida courts, the claim is barred on federal habeas.[3]  *See* Tukes, 911 F.2d at 513 (Stone v. Powell bar applied to petitioner's federal habeas claim premised on the fruits of a search conducted under an allegedly involuntary consent); *see also, e.g.*, Romero v. Jorday, 56 F. App'x 886, 889 (10th Cir. 2003) (unpublished) (Stone v. Powell bars Fourth Amendment claim of involuntary consent to search, but not Fifth Amendment self-incrimination claim); Brooks v. Sec'y, Dep't of Corr., No. 4:13cv57/WS/GRJ, 2014 WL 585318, at *2 (N.D. Fla. Feb. 14, 2014) (unpublished) (concluding that Stone v. Powell precluded federal habeas court's consideration of petitioner's Fourth Amendment challenge to state court's denial of motion to suppress DNA evidence obtained through penile swab); Oliver v. McNeil, No. 4:07cv80/SPM/WCS, 2008 WL 4724806, at *15 (N.D. Fla. Oct. 23, 2008) (unpublished) (same with respect to Fourth

---

[3] Petitioner does not assert a Fifth Amendment self-incrimination claim with respect to the officers' request for DNA consent, nor did he assert a Fifth Amendment claim in the state courts. If Petitioner had asserted such a claim, and the state court had rejected it on the merits, the adjudication would be deemed reasonable.  *See* Everett v. Sec'y, Fla. Dep't of Corr., 779 F.3d 1212, 1245 (11th Cir. 2015) (Florida Supreme Court did not unreasonably apply clearly established Supreme Court precedent in determining that a request for consent to collect DNA samples from a defendant in custody who has invoked the right to counsel was not an interrogation, did not procure any testimonial communication, and did not run afoul of Miranda and its progeny).

Amendment challenge to state court's denial of motion to suppress results of DNA evidence obtained through blood draw); <u>Dunsizer v. Crosby</u>, No. 8:04-C-99-T-30TBM, 2006 WL 510065, at *4 (M.D. Fla. Mar. 2, 2006) (unpublished) (same with respect to Fourth Amendment claim that officers searched petitioner's room without consent).

Even if Petitioner's Fourth Amendment claim was cognizable, Petitioner failed to demonstrate that the state courts' adjudication of the claim was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable applications of clearly established federal law.

> 1.     Clearly Established Federal Law

It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  <u>Katz v. United States</u>, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576; <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454–55, 91 S. Ct. 2022, 29 L. Ed. 2d 564; <u>Chambers v. Maroney</u>, 399 U.S. 42, 51, 90 S. Ct. 1975, 26 L. Ed. 2d 419.  It is equally well settled that one of the specifically established exceptions to the search warrant requirement

is a search conducted pursuant to voluntary consent.  Zap v. United States, 328 U.S. 624, 630, 66 S. Ct. 1277, 90 L. Ed. 1477.

The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and "[v]oluntariness is a question of fact to be determined from all the circumstances."  Schneckloth v. Bustamonte,  412 U.S. 218, 248–49, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).  In evaluating voluntariness, the court must examine several factors, including the defendant's custodial status, the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found."  United State v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).   The fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search.  United State v. Watson, 423 U.S. 411, 424, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976).  Similarly, under Schneckloth, the absence of proof that the subject knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance.  Schneckloth, 412 U.S. at 225).

Another exception to the search warrant requirement is the existence of "exigent circumstances."  See Coolidge v. New Hampshire, 403 U.S. 443, 474–75, 91 S. Ct.

2022, 29 L. Ed. 2d 564 (1971) (citations omitted).   Although "[c]ourts have catalogued several situations in which exigent circumstances exist, . . . it is clear that the exception must be applied carefully to each factual scenario."  United States v. Lynch, 934 F.2d 1226, 1232 (11th Cir. 1991) (citing United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983)).  "[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it . . . .'" Chimel v. California, 395 U.S. 752, 762, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969) (alterations and omissions in original) (quoting United States v. Jeffers, 342 U.S. 48, 51, 72 S. Ct. 93, 96 L. Ed. 59 (1951)).  The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action."  United States v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983).  Recognized situations in which exigent circumstances exist include:  "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect."  Blasco, 702 F.2d at 1325.

However, even if evidence is obtained in violation of the Fourth Amendment, the exclusionary rule may not warrant suppression of the evidence.  In United States

v. Leon, 468 U.S. 897, 907–08, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), the

Supreme Court explained the evolution and purpose of the exclusionary rule in the

Fourth Amendment context.  The Court stated:

> The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure "[works] no new Fourth Amendment wrong." United States v. Calandra, 414 U.S. 338, 354, 94 S. Ct. 613, 623, 38 L. Ed. 2d 561 (1974).  The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, *ibid.*, and the exclusionary rule is neither intended nor able to "cure the invasion of the defendant's rights which he has already suffered." Stone v. Powell, *supra*, 428 U.S. at 540, 96 S. Ct. at 3073 (WHITE, J., dissenting).  The rule thus operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, *supra*, 414 U.S. at 348, 94 S. Ct. at 620.
>
> Whether the exclusionary sanction is appropriately imposed in a particular case, our decisions make clear, is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." Illinois v. Gates, [462 U.S. 213, 223, 103 S. t. 2317, 76 L. Ed. 2d 527 (1983)]
> . . . .
> The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern.  "Our cases have consistently recognized that unbending application of the exclusionary sanction to enforce ideals of governmental rectitude would impede unacceptably the truth-finding functions of judge and jury." United States v. Payner, 447 U.S. 727, 734, 100 S. Ct. 243, 2445, 65 L. Ed. 2d 468 (1980).  An objectionable collateral consequence of this interference with the criminal justice

system's truth-finding function is that some guilty defendants may go
free or receive reduced sentences as a result of favorable plea bargains.
Particularly when law enforcement officers have acted in objective good
faith or their transgressions have been minor, the magnitude of the
benefit conferred on such guilty defendants offends basic concepts of the
criminal justice system.  Stone v. Powell, 428 U.S. at 490, 96 S. Ct. at
3050.  Indiscriminate application of the exclusionary rule, therefore, may
well "generat[e] disrespect for the law and administration of justice."  Id.
at 491, 96 S. Ct. at 3051.  Accordingly, "[as] with any remedial device,
the application of the rule has been restricted to those areas where its
remedial objectives are thought most efficaciously served."  United
States v. Calandra, supra, 414 U.S. at 348, 94 S. Ct. at 620; see Stone v.
Powell, supra, 428 U.S. at 486–87, 96 S. Ct. at 3048–3049; United
States v. Janis, 428 U.S. 433, 447, 96 S. Ct. 3021, 3028, 49 L. Ed. 2d
1046 (1976).

Id. at 906–07 (footnote omitted).

In Coolidge, the Supreme Court stated:

The exclusionary rules were fashioned "to prevent, not to repair," and
their target is official misconduct.  They are "to compel respect for the
constitutional guaranty in the only effectively available way—by
removing the incentive to disregard it."  Elkins v. United States, 364
U.S. 206, 217, 80 S. Ct. 1437, 1444, 4 L. Ed. 2d 1669 (1960).

403 U.S. 443, 488.

Indeed, the Supreme Court has recognized exceptions to the exclusionary rule.

One such exception is the "inevitable discovery" exception recognized in Nix v.

Williams, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).  That

exception provides that if the prosecution can establish by a preponderance of the

evidence that the information ultimately or inevitably would have been discovered by lawful means, then the deterrence rationale underlying the exclusionary rule has so little basis that the evidence should be received. *Id.*

2.   Federal Review of State Court Decision

Petitioner presented his Fourth Amendment claim to the trial court in a motion to suppress (Ex. A at 44–46). He argued that collection of the DNA samples constituted an unlawful search and seizure, in violation of the Fourth Amendment, because the samples were obtained at a time when Petitioner had been adjudged incompetent to proceed in another criminal case and thus incapable of giving legal consent to the DNA collection (*id.*). The trial court held a hearing on the motion, at which the State and Petitioner presented witnesses and other evidence (Ex. B).

Jeff Mahoney, an investigator with the Tallahassee Police Department, testified that on November 16, 2003, he investigated a sexual battery complaint by Chavelle Thompson, a young male who had lived in the same home as Petitioner for approximately six months, and who claimed that Petitioner was the perpetrator (Ex. B at 5–27). Investigator Mahoney testified that the victim had identified Petitioner as the perpetrator during an interview at the hospital with another officer, and that officer was providing information to Mahoney and Officer Copelin. Mahoney testified that

Officer Copelin transported Petitioner to the police station, and Copelin and Mahoney interviewed Petitioner.  Mahoney testified that prior to the interview, the officers attempted to contact Petitioner's mother, because Petitioner was 15 years old, but officers were initially unable to locate her. Mahoney testified that Petitioner's mother came to the police station during Petitioner's interview.  Mahoney testified that the entire interview lasted approximately two hours and was videotaped.  The videotape was admitted into evidence at the suppression hearing.  Investigator Mahoney testified that prior to interviewing Petitioner, he (Mahoney) advised Petitioner that he was a suspect in a criminal investigation, and advised Petitioner of his Miranda rights by reading the police department's standard form.  Mahoney testified that Petitioner agreed to talk to the officers.  Mahoney testified that no one made any promises or threats to Petitioner to induce him to speak with the officers.

Investigator Mahoney testified that during the interview, Petitioner responded to questions in an intelligible manner, and Petitioner's answers were responsive to his questions. Mahoney testified that he did not observe any indication that Petitioner did not understand what was going on. Mahoney testified that Petitioner denied sexually battering Chavelle Thompson, and told officers that he would provide his DNA to

prove his innocence.   Specifically on the issue of Petitioner's consent, Mahoney

testified as follows:

> Q [by defense counsel].   You told him—I think it was you, correct me if I'm wrong, you told him that the DNA was going to be done.  You said there would be DNA testing and he better not lie because if he did, if he lied he'd get into more trouble because the DNA would show that he was lying.  Essentially in words to that effect, right?
>
> A.     What I said was—is if there is DNA found on this person [the victim] and you're telling me that you didn't have any contact with this person and your DNA does come back then that is going to be a problem for you.  That is what I—in some —in those words.  Not exact words, but that's what I told him.
>
> Q.     That's what you told the juvenile Montez Willis?
>
> A.     Yes.
>
> Q.     Did you ever tell Montez Willis that he had a right to refuse the DNA and that if he did you'd have to get a search warrant or a court order?
>
> A.     He never—he was the one volunteering, wanting to give me the DNA.  It was never any—he must have said six times as far as what we counted volunteering that he wanted to give—you take my DNA.  I want to—I'm innocent.  I didn't do this.  Take my DNA.  I want it to prove that I didn't do this.
>
> Q.     Wasn't that in response to your statements or Officer Coplin's [sic] that you better not be lying and if you're lying the DNA will show that you're lying?  And then he said I'm not lying you can—the DNA will show that I'm not lying?  Wasn't that in response to the DNA discussion that you had?

A.      Officer Copelin asked him will you submit a DNA sample and that's what he said.  He said I didn't do it, I'll give you whatever you want, where ever you want.   And Officer Copelin asked do you understand that penile swabs will also be taken.  He said take where ever you want to take it from me.

Q.      Exactly.

A.      To me that's pretty voluntary as far as giving a sample. And the reason for not filling out a form is it was clearly on video tape my asking him for the DNA sample.  If it was out in the field where there was nobody around, where it wasn't on video tape or audio tape, that's where I would use a form.  But as far as us being there on video tape that's the reason for not having the form.

Q.      You're saying here today in court that you reviewed the video tape, right?

A.      Yes.

Q.      When did you review it?

A.      I've reviewed it several times.

Q.      You're saying that on that video tape you're asking Mr. Montez Willis for permission to take his DNA?

A.      Officer Copelin did.

Q.      You're saying that on the video tape Officer Coplin [sic] asked him for his consent or asked him for permission, that's what you're saying here today?

A.      Yes.  I just reviewed the tape and listened to it.

Q.      Okay.  Well, the Court's going to do that, you know, so I'm not going to argue with you about it.  But you didn't just say that the DNA's going to be taken and it will prove that you're lying?  You didn't just tell him that you were going to do the DNA no matter what?  You said you gave him a choice?  On the tape you gave him a choice?  You explained that to him?

A.      You're not—I'm not—What I'm saying is Officer Copelin asked him—

Q.      Asked him?

A.      —about DNA.  We talked about DNA, what DNA was, where it can be found.

Q.      Correct.

A.      Officer Copelin asks we would like to get DNA from you as far as some swipes of your cheek cells and also your penis, and that's when he said take whatever you'd like, I'm innocent, I didn't do this, you're not going find my DNA on him.

Q.      So—

A.      So, I'm not exactly understanding your question as far as—you're asking me a question and I'm trying to clarify exactly what was said.  But Officer Copelin did ask him about would he provide DNA.

Q.      It wasn't just a submission to authority on the part of Mr. Montez Willis, that he would go along with whatever DNA procedures you were going to employ?

A.      Even if you do watch the video tape it's very clear to me and to Officer Copelin that this was a voluntary act.  I mean, he was very—none of us used any type of force or anything to have that happen.

We did explain to him that, yes, there is consequences if your DNA is found on him.  But as far as when Officer Copelin asked him for his DNA he made numerous statements as far as wanting to provide that.

Q.      Again as far as the procedures that were used anything that you said to him about the DNA the Court should be able to see that on the video tape, right?

A.      That's correct, yes.

Q.      You didn't make any explanations or ask him any questions or talk to him off the video tape, did you?

A.      The only thing that would be off that video tape would—is when we turn off the video tape to do the swabs so that—because obviously organs are being seen.  We don't put that on video tape.

Q.      I understand.

A.      But other than that my involvement and my discussions with him are on video tape.

Q.      Okay.

A.      And if it wasn't me it was Officer Copelin that is on there as well.

Q.      So if he's being—if they're asking—if you and Officer Coplin [sic] are asking permission or asking for consent that will be on the video tape, right?

A.      Yes.

Q.      Okay.  That's fair.  Now, his mother, I think it's clear from the reports, she didn't get there until after the video—until after the swabs were—

A.      That's correct.

Q.      —employed?  Okay.

A.      She also was in favor of the DNA as well.

Q.      Well, that was after the fact, right?

A.      Yes, it was.

(Ex. B at 17–22).

On re-direct examination, Investigator Mahoney testified that by the conclusion of his interview with Petitioner, he determined that there was probable cause to arrest Petitioner, so he arrested Petitioner (Ex. B at 25).  Mahoney testified that if Petitioner had not voluntarily provided a buccal sample that night, Mahoney would have sought a search warrant to obtain it (*id.* at 26).  With regard to the penile swab, Mahoney testified that he would have collected the sample that night regardless of Petitioner's consent and the absence of a warrant, because "we consider it to be an exigent matter due to the fact that he could shower or get rid of any type of evidence by cleaning" (*id.*).

Officer Daniel Copelin testified that he had interactions with Petitioner's family since 1998 (five years prior to the November 16, 2003, interview and DNA collection) (Ex. B at 27–28).  Copelin testified that during that time, he had occasions to have

conversations with Petitioner (*id.* at 28–29).   Copelin testified that he had no indications from those conversations that Petitioner had any intellectual or developmental deficits that prevented Petitioner from understanding the questions asked by the officers during the November 2003 interview, and Petitioner's responses to those questions (*id.* at 29).   Officer Copelin testified that during the interview, Petitioner was coherent, and his answers to questions were responsive and sensible (*id.*).   Copelin testified that Petitioner never complained of confusion or an inability to understand what was occurring or what the officers were saying (*id.* at 29–30).   Copelin testified that none of the officers made promises to Petitioner or threats against him in order to get Petitioner to talk or provide DNA samples (*id.* at 30).   Officer Copelin testified that after officers initiated the discussion about DNA samples, Petitioner re-raised the issue several times during the interview, requesting that the officers take the samples (*id.* at 31).   Officer Copelin testified that when Petitioner denied the sexual battery, Copelin explained to Petitioner that if his DNA was located in the sample provided by the victim, or if the victim's DNA was located in a sample provided by Petitioner, then Petitioner would be "locked into a story," and Copelin provided Petitioner an opportunity to "change his story" and confess if he had indeed committed the crime, in order to avoid the embarrassment that would result if

he was discovered to be lying (*id.* at 32).  Copelin testified that at the time of the interview, he did not know that a court had found Petitioner incompetent to proceed in another case, nor did he know that Petitioner had low IQ and could not read at his grade level (*id.* at 34–35).

Dr. Salvatore Blandino, a clinical psychologist, testified that he evaluated Petitioner in February of 2004 (three months after the interview in which Petitioner provided DNA samples), and again in November of 2004 (Ex. B at 37–38).  Dr. Blandino testified that he concluded that Petitioner was incompetent to proceed in February of 2004 due to his borderline intellectual functioning (*id.* at 38–39).  Blandino testified that Petitioner was "really deficient" in understanding the adversarial nature of the legal process, for example, the roles and functions of defense counsel, the prosecutor, the judge, and the jury (*id.* at 39).  Dr. Blandino testified that although there is an instrument that assesses a person's understanding of the right to waive <u>Miranda</u> rights, he did not utilize that instrument in either of his evaluations of Petitioner (*id.* at 40).  Dr. Blandino testified that he administered the cognitive <u>Miranda</u> test to Petitioner the week prior to the suppression hearing (which was on February 11, 2008), and Petitioner "did not do well on that test at all" (*id.* at 43).  Dr. Blandino testified that based upon his evaluations of Petitioner, his review of other

doctors' evaluations of Petitioner both before and after the November 2003 interview, the results of the Miranda test he administered, and his review of the videotape of the November 2003 interview, he did not believe that Petitioner understood his Miranda rights, nor did Petitioner have the capacity or competency to waive those rights (*id.* at 43–46).  Blandino further testified that he did not believe that Petitioner had the ability to knowingly, voluntarily, and intelligently consent to either talking to the officers or providing DNA samples (*id.* at 60).  Dr. Blandino testified that Petitioner's consent appeared to be the product of acquiescence and a willingness to please or "get it over with," as opposed to truly understanding his options (*id.* at 48–49).  Blandino testified that upon viewing the videotape of the November 2003 interview, he did not observe any coercive police conduct (*id.* at 49–50).  He testified that it appeared that the officers did not know that Petitioner was cognitively impaired or that he required more explanation in order to understand (*id.* at 50).

On cross-examination, Dr. Blandino agreed that during his February and November 2004 evaluations of Petitioner, he was looking at six specific criteria for determining competency to go to trial, which were not the same criteria for assessing Petitioner's ability to decide whether to agree to taking a test or talking to someone (Ex. B at 55).  Dr. Blandino also agreed that the decision of whether to take a test or

talk to someone was a lot less complicated than understanding the adversarial nature of the legal process (*id.* at 55–56).

Dr. Ann McMillan, a clinical and forensics psychologist, testified that she evaluated Petitioner in September 2003, and determined that he was incompetent to stand trial in a juvenile case pending at that time (Ex. B at 68–69).  Dr. McMillan testified that she evaluated Petitioner again for purposes of the suppression hearing in February of 2008, to assess whether Petitioner knowingly and intelligently waived his Miranda rights, and whether he voluntarily consented to provide DNA samples (*id.* at 70, 82–83).   Dr. McMillan testified that she did not believe that Petitioner understood his rights, or that he knowingly and intelligently waived them (*id.* at 71).  Dr. McMillan testified that she viewed the videotape of the November 2003 interview with police, and specifically with regard to Petitioner's consent to provide DNA samples, she did not believe that Petitioner could understand the implications and complications that could result from his consent (*id.* at 72–73).  She testified that in her professional opinion, Petitioner acquiesced but did not voluntarily consent (*id.* at 73–74).

During Dr. McMillan's testimony, she referenced the fact that the videotape showed that Petitioner was handcuffed to a chair during the interview with the officers (Ex. B at 76).

Defense counsel argued that Petitioner's consent to the DNA collection was not voluntary, and was instead mere acquiescence due to the fact that he was a juvenile with impaired cognitive abilities, and simply wished to "get it over with" and please the officers (Ex. B at 84–87). Defense counsel conceded that there was no police trickery or deception involved. Counsel argued that the officers should have obtained a court order prior to collecting the DNA samples, and that the officers' testimony that they would have done so was self-serving.

The prosecutor argued that Petitioner's consent was voluntary. He argued that Petitioner was adamant that he was innocent of the sexual battery, and adamant in his desire to provide DNA samples (Ex. B at 87–90). The prosecutor additionally argued that it was "absolutely necessary" to obtain the DNA samples, and if Petitioner had refused, the officers would have obtained a search warrant to collect the buccal swab, and the officers would have obtained the penile swab with or without a search warrant, based upon exigent circumstances.

The trial court denied the motion to suppress in a written decision rendered

February 27, 2008 (Ex. A at 91–92).  The court reasoned as follows:

> THIS CASE is before me on Defendant's Motion to Suppress evidence obtained from DNA samples extracted from him during the investigation of another case.  For the reasons set forth below, I deny the Motion.
>
> Defendant was a suspect in a reported attempted sexual battery.  During questioning, he was asked if be would provide DNA samples and he readily agreed. The Defendant now contends that because of his age (15 years) and his limited intellectual function (70–84 range IQ), he was not capable of giving a knowing and voluntary consent.  I can not agree.
>
> The science of DNA and the details of the testing procedure may be rather difficult for some people to understand.  The concept of a DNA test, however, is a simple one, [We have a way to determine whether or not you had contact with this person (which you deny).  To do this, we need to take a swab sample from your mouth and penis, then run a test on them.  Will you give us the samples?)] the Defendant understood what he was agreeing to do and its implications.  The consent was voluntary.
>
> Moreover, even without Defendant's consent, the officers had sufficient probable cause to compel the samples.  Thus, pursuant to the doctrine of inevitable discovery, the DNA evidence would have been obtained regardless of the Defendant's consent.

(Ex. A at 91).

Petitioner raised the suppression issue as Issue One on direct appeal (Ex. F).

The First DCA affirmed the judgment in a decision issued on December 29, 2009 (Ex.

I).

"Voluntariness is a question of fact to be determined from all the circumstances . . . ." Schneckloth, 412 U.S. at 248–49; *see also* United States v. Yeary, 740 F.3d 569, 581 (11th Cir. 2014) (a trial court's determination that consent to search was voluntary is a finding of fact).  Here, the state court found as fact that Petitioner's consent to collection of the DNA samples was voluntary.  This factual finding is entitled to a presumption of correctness unless Petitioner rebuts that presumption with clear and convincing evidence.  Petitioner has not done so in this case.  No doubt some circumstances weigh against the finding of voluntariness, for example, Petitioner's status as a juvenile, his being handcuffed to a chair during the interrogation, and Petitioner's education and intelligence, as described by the psychological experts at the suppression hearing.  However, factors also weighed in favor of the finding of voluntariness, for example, the absence of coercive police procedures, the officers' properly advising Petitioner of his Miranda rights, Petitioner's cooperation with the officers, Petitioner's desire to prove his innocence and belief that no incriminating evidence would be found, and the fact that Petitioner's mother ratified the decision to take DNA samples, albeit after the samples were already collected.  The evidence is far from clear and convincing on the factual issue

of voluntariness; therefore, this federal court must afford a presumption of correctness

to the state court's factual finding that Petitioner's consent was voluntary.

Additionally, the state court reasonably determined that Petitioner's DNA

profile would have been inevitably discovered.  Under Florida law, in order to apply

the inevitable discovery doctrine, there does not have to be an absolute certainty of

discovery, rather, "just a reasonable probability."  State v. Ruiz, 502 So. 2d 87, 87

(Fla. 4th DCA 1987) (citing United States v. Brookins, 614 F.2d 1037 (5th Cir.

1980)); see also Jeffries v. State, 797 So. 2d 573, 578 (Fla. 2001) (quoting Ruiz).

In Fitzpatrick v. State, the Florida Supreme Court stated:

> Moreover, even if there was police misconduct in pressuring
> Fitzpatrick to provide a blood sample, the DNA evidence was properly
> admitted because Fitzpatrick's DNA would ultimately have been
> discovered.  In Nix v. Williams, 167 U.S. 431, 448, 104 S. Ct. 2501, 81
> L. Ed. 2d 377 (1984), the United States Supreme Court adopted the
> "inevitable discovery" exception to the "fruit of the poisonous tree"
> doctrine.  Under this exception, "evidence obtained as the result of
> unconstitutional police procedure may still be admissible provided the
> evidence would ultimately have been discovered by legal means."
> Maulden v. State, 617 So. 2d 298, 301 (Fla. 1993).  In adopting the
> inevitable discovery doctrine, the Supreme Court explained, "Exclusion
> of physical evidence that would inevitably have been discovered adds
> nothing to either the integrity or fairness of a criminal trial."  Nix, 467
> U.S. at 446, 104 S. Ct. 2501.  In making a case for inevitable discovery,
> the State must demonstrate "that at the time of the constitutional
> violation an investigation was already under way."  Moody v. State, 842
> So. 2d 754, 759 (Fla. 2003) (quoting Nix v. Williams, 467 U.S. 431, 457
> 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984) (Stevens, J., concurring in the

> judgment)); *see also* <u>Jeffries v. State</u>, 797 So. 2d 573, 578 (Fla. 2001);
> <u>Maulden</u>, 617 So. 2d at 301.  In other words, the case must be in such a
> posture that the facts already in the possession of the police would have
> led to this evidence notwithstanding the police misconduct.  *See* Moody,
> 842 So. 2d at 759.

900 So. 2d 495, 514 (Fla. 2005).

In <u>Fitzpatrick</u>, the defendant alleged that his consent to giving a blood sample

had been coerced because his parole officer told him he would revoke his parole.  900

So. 2d at 513.  The court found that Fitzpatrick's DNA would have been inevitably

discovered because the police had already begun to investigate him because he was

the last person seen leaving the victim's home.  *See id.* at 514.  The court continued:

> Based on this evidence, requesting a blood sample from Fitzpatrick or
> obtaining it through a warrant would have been a normal investigative
> measure that would have occurred regardless of any police impropriety.

*Id.*  The court concluded that even if the consent was involuntary, "the error is

harmless because the police had probable cause for a warrant requiring a blood sample

and the blood sample would have been inevitably obtained."  *Id.*

Here, at the time the officers collected Petitioner's DNA sample in November

of 2003, they were investigating a complaint from Chavelle Thompson that Petitioner

sexually battered him.  According to Investigator Mahoney, Thompson told an officer,

during an interview at the hospital on the night Petitioner was interviewed by

Mahoney and Copelin, that Petitioner had perpetrated the sexual battery.  The victim and Petitioner knew each other, because the victim lived with Petitioner and Petitioner's family for approximately six months, thus identity was not an issue. Petitioner denied that he had sexual contact with Thompson.  At the conclusion of the interrogation, Investigator Mahoney determined that there was sufficient probable cause to arrest Petitioner for the sexual battery, and he arrested Petitioner. Accordingly to Mahoney, even if Petitioner had refused to consent to the DNA collection, Mahoney would have applied for a search warrant to perform the buccal swab.  In the order denying the motion to suppress, the trial court determined that the officers had probable cause to compel Petitioner to provide the DNA samples.  Indeed, in a decision issued by the Supreme Court after the trial court's order, and during the pendency of Petitioner's direct appeal, the Supreme Court held that a search using a buccal swab to obtain a defendant's DNA sample after arrest for a serious offense was reasonable under the Fourth Amendment.  Maryland v. King, — U.S. —, 133 S. Ct. 1958, 1980, 186 L. Ed. 2d 1 (2013).  Thus, Petitioner's DNA profile would have inevitably been discovered.

Even if Petitioner's Fourth Amendment claim is not barred by Stone v. Powell, Petitioner failed to demonstrate that the state courts' adjudication of the Fourth

Amendment issue was based upon an unreasonable determination of the facts, or that it was contrary to or an unreasonable application of clearly established Supreme Court precedent.  Therefore, he is not entitled to federal habeas relief on Ground One.

> **B.    Ground Two:  "The State trial court erred in allowing the State to enter into evidence a description of a list allegedly authored by the Petitioner saying it was a list of gear needed for a "Lick", since it was not relevant or, in the alternative, any probative value was substantially outweighed by the danger of unfair prejudice, thereby depriving Petitioner of his rights to a fair trial and to due process of law guaranteed by the Constitution of the State of Florida and the Constitution of the United States of America."**

Petitioner alleges that during the State's opening statement, the prosecutor stated that he expected the evidence to show that officers searched Petitioner's residence and found a list titled, "My Gear for Them Licks," which included the notation, "all black everything," including black "high tops," black leather gloves, black "Army" pants, and a black ski mask (*see* ECF No. 1, Attachment 2).  Petitioner alleges defense counsel moved for a mistrial, arguing that this evidence had very little relevance, and was highly prejudicial because it suggested the commission of other crimes.  The State argued that the list was relevant to the crime charged, and that even though the list was not signed by Petitioner, it was found among items relating to his court case.  The trial court denied the motion for mistrial.  Additionally, defense counsel objected to admission of the list during trial, on the ground that it was

improper character evidence.  The State decided not to seek admission of the list into evidence, but questioned an officer regarding discovery of the list during the search of Petitioner's residence, and the content of the list.  The officer testified that the list included certain items.  Petitioner argued on direct appeal that the trial court erred by admitting the officer's testimony describing part of the content of the list, on the ground that the list was irrelevant, and any probative value was outweighed by the danger of unfair prejudice.

Respondent concedes that Petitioner exhausted this claim in the state courts by presenting it on direct appeal (ECF No. 17 at 30).  Respondent contends the state courts' adjudication of the evidentiary issue was not contrary to or an unreasonable application of Supreme Court precedent (*id.* at 30–35).

1.     Clearly Established Federal Law

Federal courts will not generally review state trial courts' evidentiary determinations.  *See* Hall v. Wainwright, 733 F.2d 766, 770 (11th Cir. 1984); Lisenba v. California, 314 U.S. 219, 228, 62 S. Ct. 280, 86 L. Ed. 166 (1941) ("We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence.").  Indeed, in a habeas corpus action brought by a state prisoner, the federal court's authority is "severely restricted" in the review of state

evidentiary rulings.  Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983) (per curiam);

Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)

("[I]t is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions.  In conducting habeas review, a federal court

is limited to deciding whether a conviction violated the Constitution, laws, or treaties

of the United States.").  Habeas relief is warranted only when the error "so infused the

trial with unfairness as to deny due process of law."  Lisenba, 314 U.S. at 228; see

Estelle, 502 U.S. at 75 (holding that habeas relief was not warranted because neither

the introduction of the challenged evidence, nor the jury instruction as to its use, "so

infused the trial with unfairness as to deny due process of law"); Bryson v. Alabama,

634 F.2d 862, 864–65 (5th Cir. Unit B Jan. 1981)[4] ("A violation of state evidentiary

rules will not in and of itself invoke Section 2254 habeas corpus relief.  The violation

must be of such a magnitude as to constitute a denial of 'fundamental fairness.'"); cf.

Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)

(concluding that the exclusion of "critical evidence" denied the defendant "a trial in

accord with traditional and fundamental standards of due process").

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the Fifth Circuit Court of Appeals issued before the close of business on September 30, 1981.

2.    Federal Review of State Court Decision

Petitioner argued on direct appeal that the trial court's admission of testimony describing certain items on the list found in Petitioner's residence by law enforcement was irrelevant or, alternatively, that any probative value was substantially outweighed by the danger of unfair prejudice, thereby depriving Petitioner of his rights to a fair trial and due process of law guaranteed by the Florida and United States Constitutions (Ex. F at 31–37).  The First DCA affirmed the judgment (Ex. I).

The undersigned concludes that the trial court's admission of a description of the list did not come close to denying Petitioner fundamental fairness.  Initially, the evidence was relevant. The State presented testimony from Shannon Gerry, a forensic specialist with the Tallahassee Police Department, that during the search of Petitioner's home, law enforcement found a pair of black pants with soil and debris on them, a black "skull cap," and a black glove, in a northeast bedroom (Ex. D at 137–55).  Officer Gerry also testified that a handwritten list was found in the bedroom, and bore the date of August 27, 2005.  She testified that it was a list of "my gear" to be used in a "lick," which was street slang for a crime.  Officer Gerry testified that the list was discovered with other items belonging to Petitioner.  She testified that the list included "all black everything," black high top boots, black leather gloves,

black Army pants, a black ski mask, and a black belt.  Officer Gerry testified that item

17 on the list stated, "And before I got hit [sic] this lick, shave between my legs and

get all the hair."

The list demonstrated Petitioner's methodology for committing the crime, his

intent to commit the crime and his preparation related to the commission of the crime.

The parties and the court redacted certain items from the list, and the officer did not

testify regarding the redacted items.  The State took additional precautions to limit the

prejudicial effect of the list by asking the officer about listed items found in

Petitioner's possession or related to the victim's description of the perpetrator, with

the exception of item 17.  Item 17 was separately relevant to establish planning and

preparation for a sexual battery or attempted sexual battery, the crime with which

Petitioner was charged.  The list itself was not admitted into evidence.

Moreover, the evidence against Petitioner was overwhelming.  The victim

testified that the perpetrator had wrapped her blue sweater around his face prior to

waking her up (Ex. D at 48–52).  She additionally testified that the attacker was

wearing a black ski-cap, a black long-sleeved shirt, black pants, and black gloves (*id.*

at 53–54).  The victim testified that police found her blue sweater in the dumpster at

an apartment complex next door.  Joellen Brown, a crime laboratory analyst with the

Florida Department of Law Enforcement, testified that the victim's blue sweater contained both the victim's DNA and Petitioner's DNA (*id.* at 154–59).

Even if the trial court erred by admitting testimony of some of the items included on the list, the error did not infuse the trial with unfairness as to deny due process of law. Therefore, Petitioner is not entitled to federal habeas relief on Ground Two.

C.   Ground Three:   "Counsel was constitutionally deficient (6th Amendment) for not challenging the lack of evidence/variance between the charged conduct and evidence adduced at trial."

Petitioner alleges he was charged with attempted sexual battery "by attempting to penetrate the vagina without the victim's consent" (ECF No. 1 at 10). He alleges the jury was instructed that one of the elements of the crime was that he "attempted to penetrate the vagina of" the victim without her consent. Petitioner argues that even though the State presented evidence that he attempted a sexual act with the victim, there was no evidence showing that he, at any time or in any manner, attempted to penetrate the victim's vagina. Petitioner claims that defense counsel was ineffective for failing to argue that the State failed to present evidence of the charged offense.

Respondent concedes that Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (ECF No. 17 at 36). Respondent contends the state courts'

adjudication of the claim was not contrary to or an unreasonable application of Supreme Court precedent (*id.* at 36–40).

>        1.        Clearly Established Federal Law

The standard for evaluating a claim of ineffective assistance of counsel is the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). The two components of an ineffectiveness claim under Strickland are deficient performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. Strickland, 466 U.S. at 697. The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective

at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of

demonstrating prejudice is high.  *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th

Cir. 2002).   The Supreme Court has cautioned that "'[i]t is not enough for the

defendant to show that the errors had some conceivable effect on the outcome of the

proceeding.'"  *Id.* (quoting Strickland, 466 U.S. at 693).  However, the Court has also

clarified that a petitioner need not demonstrate it "more likely than not, or prove by

a preponderance of evidence," that counsel's errors affected the outcome.  Strickland,

466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but
> for counsel's unprofessional errors, the result of the proceeding would
> have been different.  A reasonable probability is a probability sufficient
> to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland

for a state court to reject an ineffectiveness claim for failing to prove prejudice by a

preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the

particular decisionmaker," as the court should presume that the judge or jury acted

according to law.  Strickland, 466 U.S. at 694–95.  "When a defendant challenges a

conviction, the question is whether there is a reasonable probability that, absent the

errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal.  *See* Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult."  Richter, 131 S. Ct. at 788. As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Id.* (citations omitted).

          2.      Federal Review of State Court Decision

The information charged the following, with respect to the attempted sexual battery count:

> COUNT II:  On or about January 5, 2006, [Petitioner] did unlawfully attempt to commit a sexual battery upon Olivia Lamer, a person twelve years of age or older, by attempting to penetrate her vagina, without the victim's consent, contrary to Sections 777.04 and 794.011(5), Florida Statutes.

(Ex. A at 1).

Florida Statutes define sexual battery as "oral, anal, or vaginal penetration by, or union with, the sexual organ of another or the anal or vaginal penetration of another by any object; . . . ."  Fla. Stat. § 794.011(1)(h).

The Florida Rules of Criminal Procedure govern the sufficiency of a criminal information:

> (1) *Allegation of Facts; Citation of Law Violated*.  Each count of an indictment or information on which the defendant is to be tried shall allege the essential facts constituting the offense charged.  In addition, each count shall recite the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.  Error in or omission of the citation shall not be ground for dismissing the count or for a reversal of a conviction based thereon if the error or omission did not mislead the defendant to the defendant's prejudice.

Fla. R. Crim. P. 3.140(d).  A defect in the information alone is insufficient to warrant

dismissal:

> (o) **Defects and Variances.**  No indictment or information, or any count
> thereof, shall be dismissed or judgment arrested, or new trial granted on
> account of any defect in the form of the indictment or information or of
> misjoinder of offenses or for any cause whatsoever, unless the court shall
> be of the opinion that the indictment or information is so vague,
> indistinct, and indefinite as to mislead the accused and embarrass him or
> her in the preparation of a defense or expose the accused after conviction
> or acquittal to substantial danger of a new prosecution for the same
> offense.

Fla. R. Crim. P. 3.140(o).   The standard for dismissal of a deficient charging

document is high.

To preclude a conviction based upon a variance in the allegations of the

charging document and proof submitted at trial, Petitioner must show, first, that there

was a material variance in the factual allegations of the charging document and the

proof at trial and, second, that the record reveals a possibility that the variance resulted

in substantial prejudice to Petitioner, such as inhibiting his ability to present his

defense and not be taken by surprise by the evidence offered at trial, or subjecting him

to a substantial possibility of new prosecution for the same offense.  *See* Thompson

v. Nagle, 118 F3d 1442, 1453 (11th Cir. 1997) (citing Berger v. United States, 295

U.S. 78, 82, 55 S. Ct. 629, 79 L. Ed. 1315 (1935); United States v. Starrett, 55 F.3d

1525, 1553 (11th Cir. 1994)); Fla. R. Crim. P. 3.140(o).

Petitioner raised this ineffective assistance of counsel ("IAC") claim as Ground

1 in his Rule 3.850 motion (Ex. J at 6–7).  The state circuit court held an evidentiary

hearing, at which Petitioner's trial counsel, Attorney Joel Remland, testified (*id.* at

72–99).  Remland testified that he had been practicing law for approximately 37–38

years, primarily in the area of criminal defense.  He testified that at the time of

Petitioner's trial, he had tried "several hundred" cases.  Attorney Remland testified

that he reviewed the discovery in Petitioner's case, and also reviewed it with

Petitioner.

The court questioned Attorney Remland regarding Ground 1 as follows:

THE COURT:  As I understand, their claim is that the—he's not
contending there was not evidence that an attempted sexual battery
occurred, but he is contending that the information says there was
attempted battery with intent to penetrate her vagina, and he's
contending there wasn't evidence that he intended to penetrate her
vagina presented at trial.

Do you think that gives you any legal basis to move to dismiss or
get a judgment of acquittal on that basis; in other words, there was a
factual basis for an attempted sexual battery, but not necessarily in that
exact way?

THE WITNESS:  Yes, I think I could have—I don't know what
I argued.  I don't know the exact arguments I made, but I think I could

have argued, now that I'm thinking about it, I reviewed the case again this morning, that he didn't do enough for it to be—to show that he was trying to penetrate by fondling her or just touching her on the outside area.  He seemed to be satisfied with just looking at her and just talking about seeing—the language I saw from the victim was he [Petitioner] just wanted to look at it or something like that, or touch me [the victim] or something like that.

I don't recall now if there's any evidence that he actually was putting his hands under her clothing and touching her and trying to insert his fingers or something of that nature, or his penis.  There was no evidence like that.  He hadn't gone that far.  So I guess I could have made an argument that there wasn't enough evidence to show that he tried to penetrate her vagina.

Of course, he was saying he wasn't even there.  But, for purposes of a JOA, I don't think there was enough evidence probably to sustain that he was actually, physically trying to penetrate her vagina probably.

THE  COURT:   Now,  you're  saying  you  could  make  that argument?

THE WITNESS:  I could make that argument, yes.

THE COURT:  Do you think it's likely that Judge Lewis would have granted that motion?

THE WITNESS:  I don't know.  He might have said it's a jury question.  I don't know.
. . . .
Q [by counsel for the State]:  Now, if you would have made that argument, would Mr. Wade [the prosecutor] have been in a position to move to orally amend the information to conform to the evidence presented?

A.  I guess so, yes.

Q.  And you knew—and, namely, I'm talking about where there were times whenever the defendant was requesting the victim perform oral sex on him?

A.  Yes.

Q.  So you would not have been prejudiced by any attempt to orally amend to conform the charge to the proof presented; is that correct?

A.  No.  I was aware what the evidence was.

(Ex. J at 96–98).

At the conclusion of the evidentiary hearing, the court stated its reasons for

denying the IAC claim:

THE COURT:    I don't find that there's been ineffective assistance of counsel proven or any prejudice shown.

Specifically, I'll go through the grounds alleged.  Ground one, as to the variance in the information, it could have been easily fixed by the State Attorney asking to amend.  Frankly, I think it's highly unlikely that Judge Lewis would have granted a judgment of acquittal based upon that.  And I would remind everybody, which I'm sure you're aware, this only would apply to Count II [attempted sexual battery], which is the offense that he was given five years probation on.  It would have had no effect on what I'm sure he's really concerned about, which is Count I [burglary of a dwelling with assault], where he's serving 20 years in prison on it.  The attempted sexual battery was the least of his problems. Frankly, I don't find there was ineffective assistance of counsel or prejudice.
. . . .
There certainly was sufficient evidence in the record to uphold the attempted sexual battery charge.  On Page 50 of the transcript, the victim

> testifies that when she woke up the defendant was standing over her and
> was talking about doing sexual stuff, that he started undressing or that he
> put his hands on her breasts and vagina, and discussed sexual conduct
> with her.  There was certainly sufficient evidence to go to the jury as to
> whether there was an attempted sexual battery.

(Ex. J at 106–08).  The circuit court adopted and incorporated its oral findings into its

written decision denying Petitioner's Rule 3.850 motion (Ex. J at 33).  Petitioner

raised this claim on appeal to the First DCA (Ex. L).  The appellate court affirmed the

lower court's decision without written opinion (Ex. N).

Petitioner claims the variance in the charge and the evidence adduced at trial

constituted grounds for dismissal of the charge, or an arrest of judgment.  However,

the record does not support this conclusion.  The information with which the State

provided defense counsel listed the charge and the statutory reference.  As a matter of

Florida law, the statutory reference provided in the charge gave Attorney Remland

adequate notice of being charged with each element of the offense.  Duboise v. State

of Florida, 520 So. 2d 260, 265 (Fla. 1988) (when information cites a statute,

defendant is on notice that he is charged with each element of the offense in the

statute); see also Calloway v. State of Florida, 37 So. 3d 891, 894 (Fla. 1st DCA

2010) (same).

Furthermore, Attorney Remland testified at the evidentiary hearing that he requested and reviewed discovery from the State.   Florida's rules of criminal procedure require the prosecutor to disclose all police and investigative reports.  *See* Fla. R. Crim. P. 3.220(1)(B).   The criminal complaint in this case alleged that Petitioner "did unlawfully attempt to commit a sexual battery upon Olivia Lamer, . . . by attempting to caress on [sic] her breast and vaginal area and asking for her to perform oral sex on him, . . . ." (Ex. A at 6).   Additionally, the probable cause affidavit, which was also part of routine discovery,  stated that the victim told police that Petitioner unzipped her robe and started touching her breast and vaginal area with his hands (*id.* at 8).   Under these facts, there is no reasonable possibility that Attorney Remland or Petitioner was unaware of the essential facts of which Petitioner was accused or the evidence the State intended to present at trial; indeed Attorney Remland testified that he was aware of the evidence.   Therefore, Petitioner was not prejudiced in the preparation or presentation of his defense.

Additionally, there is no reasonable probability the result of trial would have been different if Attorney Remland had sought dismissal of the charge on the basis of the variance between the facts alleged in the information and the evidence adduced at trial.   At trial, Olivia Lamer, the victim, testified that on the night in question, she fell

asleep and woke up to see someone standing over her (Ex. D at 48–49).  She asked the

man what he was doing, and he said "he just wanted to do sexual stuff" (*id.* at 50).

Ms. Lamer testified that Petitioner told her that he wanted to see her body and began

unzipping her pajamas (*id.*).  She testified that Petitioner touched her breasts and

"vagina area" (*id.*).  Ms. Lamer testified that Petitioner said he wanted her to show

him her body and "suck his dick," and that he wanted to touch her (*id.* at 51, 54).  She

testified that Petitioner said he would not hurt or rape her (*id.* at 55).  Ms. Lamer

testified that Petitioner was hugging her and touching her "everywhere" (*id.* at 63).

As the post-conviction court determined, the prosecutor could have simply

amended the information to include that facts alleged by Ms. Lamer.  The court also

determined that there was sufficient evidence to go to the jury on the attempted sexual

battery charge, therefore, a motion for judgment of acquittal would not have been

successful. This court must abide by the state court's interpretation of state law,

including the sufficiency of the evidence to submit the case to the jury.[5]  *See*

---

[5] There is also no reasonable probability that the trial court would have properly granted a motion in arrest of judgment if Attorney Remland had made one.  Under Florida law, the court may grant a motion in arrest of judgment only on one or more of the following grounds:

(a) The indictment or information on which the defendant was tried is so defective that it will not support a judgment of conviction.

(b) The court is without jurisdiction of the cause.

Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005);

Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).

In light of the foregoing, the state court reasonably concluded that Petitioner failed to demonstrate deficient performance and prejudice with respect to Petitioner's claim that Attorney Remland was ineffective for failing to argue that the variance in the facts alleged in Count II of the charging document and the evidence adduced at trial warranted dismissal of the attempted sexual battery charge.

Petitioner failed to demonstrate that the state court's adjudication of Ground Three was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of Strickland. Therefore, Petitioner is not entitled to habeas relief on Ground Three.

D.    Ground Four: "Counsel was constitutionally deficient (6th Amendment) for failing to secure alibi witnesses."

Petitioner claims that Attorney Remland was ineffective for failing to call his family members as alibi witnesses (ECF No. 1 at 12). He alleges he was at home with

---

(c) The verdict is so uncertain that it does not appear therefrom that the jurors intended to convict the defendant of an offense of which the defendant could be convicted under the indictment or information under which the defendant was tried.

(d) The defendant was convicted of an offense for which the defendant could not be convicted under the indictment or information under which the defendant was tried.

Fla. R. Crim. P. 3.610. Here, none of the grounds for a Rule 3.610 motion were satisfied.

his family from 1:00–9:00 a.m. on the morning in question, and that his sister (Erika Hayes), cousin (Donte Potter ), and brothers (Tony Potter and Rodger Hayes) would have testified to this fact (*id.*).  Petitioner alleges his mother, Natelie Potter, was also home that morning, but she was asleep part of the time (*id.*).

Respondent  concedes that Petitioner exhausted this claim by presenting it in his Rule 3.850 motion (ECF No. 17 at 41).  Respondent contends the state courts' adjudication of the claim was not contrary to or an unreasonable application of Supreme Court precedent (*id.* at 41–46).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground 2 in his Rule 3.850 motion (Ex. J at 7). At the evidentiary hearing, Petitioner testified that he provided Attorney Remland with the names of the five alibi witnesses mentioned *supra* (*id.* at 7, 60).  Two of those witnesses testified at the evidentiary hearing, Erika Hayes and Donte Potter.  Erika Hayes testified that she was Petitioner's sister (*id.* at 57).  Ms. Hayes testified that she was available to testify at Petitioner's trial, and that she would have testified that Petitioner was home on the night in question (*id.*).  On cross-examination, Ms. Hayes

admitted that after she went to bed that night, she did not know where Petitioner was (*id.* at 61).

Donte Potter testified that he was Petitioner's cousin (Ex. J at 62).  Mr. Potter testified that he was available to testify at Petitioner's trial, and that he would have testified that Petitioner was with him at the family home on the night the crimes occurred (*id.* at 63).  Mr. Potter testified that on that night, he drank so much alcohol that he fell down on the floor (*id.* at 67); however, he clarified that he was not intoxicated to such a degree that he did not know who was there that night (*id.* at 67–68, 70).

Attorney Remland testified that his defense investigator, Betty Fuentes, advised him that she met with Petitioner, and he admitted to her that he was in the victim's apartment on the night in question but denied that he sexually assaulted the victim (Ex. J at 77).  Attorney Remland testified that he and Ms. Fuentes met with Petitioner at the jail, and Remland told Petitioner that Fuentes reported that Petitioner admitted he was at the victim's apartment that night (*id.* at 77–78).  Remland testified that Petitioner "just sat there" (*id.*).  Remland testified, "I asked him point blank and he said to me he didn't want to talk about it." (*id.*).  Remland testified that he was not aware of any alibi witnesses (*id.* at 79–80).  He testified, "I looked through my files,

all the notes I had, everything, and I never found anything about alibi witnesses."

(*id.*).  He testified further that Petitioner had plenty of opportunity to tell him about

any alibi witnesses, but Petitioner did not (*id.* at 80, 95–96).  Remland testified that

if someone had told him about alibi witnesses, he "of course" would have noted it (*id.*

at 79–80).

At the conclusion of the evidentiary hearing, the court stated its reasons for

denying the claim:

> THE COURT:  I accept Mr. Remland's testimony that he was not
> presented with an alibi.  More specifically, he was presented with a
> credible report from his investigator that the defendant had admitted that
> he was present at the scene.  Frankly, Mr. Remland would have had a
> difficult ethical decision to make.  Even if the defendant had proposed
> an alibi to him, frankly, that would be the kind of thing that would
> clearly have stood out in his mind and I find that there was no alibi
> presented to Mr. Remland.
>
> Beyond that, I would say that, frankly, the witnesses presented
> here were terrible witnesses, highly unlikely to have affected the
> outcome of this case.
>
> The one witness, the female witness, Ms. Hayes, indicated she
> doesn't know what happened after they went to bed.  The transcript
> showed that this occurred at 3:00 in the morning.  TPD received the call
> at 3:15 a.m., according to Officer Guerra, and he was there shortly
> thereafter.  So she has no idea where Mr. Willis was at 3:00 in the
> morning.

> The other witness, pretty incredibly, says he was with him every minute all night, even though he was stumbling drunk. Simply not believable testimony.

(Ex. J at 107–08). The court adopted and incorporated its oral findings in its written decision denying Petitioner's Rule 3.850 motion (Ex. J at 33). Petitioner raised this IAC claim on appeal to the First DCA (Ex. L). The appellate court affirmed the lower court's decision without written opinion (Ex. N).

The mere fact that witnesses might have been available for trial is not a sufficient ground to prove ineffectiveness of counsel. *See* Waters v. Thomas, 46 F.3d 1506, 1512, 1514 (11th Cir. 1995). "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Here, the state court found Attorney Remland's testimony credible, that he was never informed of any alibi witnesses. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); *see also* Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also gives a certain amount of deference to

credibility determinations, that deference is heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the record might disagree about the [witness'] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination")).  Federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 434, 103 S. Ct. 843, 74 L. Ed. 2d 646 (1983); *see also* Baldwin v. Johnson, 152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing."). Questions of the credibility and demeanor of a witness are questions of fact.  *See* Consalvo, *supra* (citing Freund v. Butterworth, 165 F.3d 839, 862 (11th Cir. 1999) (en banc)).  The AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e).

Petitioner has failed to overcome, by clear and convincing evidence, the state court's finding that Attorney Remland's testimony was credible.  In light of the fact that Remland was never informed of existence of any alibi witnesses, Remland was not ineffective for failing to present such testimony at trial.

Additionally, Petitioner's assertions as to what Tony Potter, Rodger Hayes, and Natelie Potter would have testified is purely speculative.  He did not proffer any evidence to the state court, in the form of affidavits, testimony at the evidentiary hearing, or the like, as to the content of the proposed trial testimony of any of these witnesses.  In the absence of evidence that any of these witnesses would have testified in support of an alibi defense, the state court reasonably denied Petitioner's IAC claim as to these alleged alibi witnesses.

With regard to Erika Hayes' testimony, although she testified that Petitioner was with her at the family home on the night the crimes occurred, she admitted that she went to sleep at some point in the evening, and that she did not know where Petitioner was when she was sleeping.  The state court reasonably determined that the victim, Ms. Lamer, testified that she was awakened by the burglar at 2:30–3:00 a.m., which is likely a time when Ms. Hayes was in bed.  With regard to Donte Potter, the

state court reasonably determined that his proposed testimony would not have been credible in light of his admission that he was stumbling drunk on the night in question.

Moreover, faced with information from his own investigator that Petitioner admitted to that he was at the victim's apartment on the night the crimes occurred, Attorney Remland was not ineffective for failing to present testimony from Petitioner's family that he was with them when the crimes occurred.

The state court's adjudication of Petitioner's IAC claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of Strickland.  Therefore, Petitioner is not entitled to habeas relief on Ground Four.

## IV.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 2<u>nd</u> day of November 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**